# Watson *against* O'Hern.

Whatever words are sufficient to explain the intent of the parties, that the one should divest himself of the property, and the other come into it for a determinate time, whether they run in the form of a license, covenant or agreement, will in construction of law amount to a lease, as effectually as if the most proper and technical words were made use of for that purpose.

A lease of a stone quarry in consideration that the lessee shall pay to the lessor a certain price per perch for all stone taken out of it, is a contract on the part of the lessee that he will work the quarry; and upon his failure so to do the lessor may maintain covenant on the contract and recover damages. And one verdict and judgment on such contract, pending the lease, is not a bar to another, when the term is further advanced.

ERROR to the district court of *Allegheny* county.

John O'Hern against Robert Watson and William Booth. This was an action of covenant upon the following agreement:

"Articles of agreement, made and concluded by and between John O'Hern, of the borough of Allegheny, of the one part, and Robert Watson and William Booth, stonecutters, of said borough, of the other part; witnesseth, that the said O'Hern doth, on the conditions hereinafter mentioned, let on a lease of six years, commencing on this 5th day of February 1834, unto the said Robert Watson and William Booth, jointly, the privilege of quarrying and hauling away all the stone they may be able to find use for, during the said term of six years, and liberty to quarry the same all over the present face of said quarry, and also to extend the said face as far eastward as they please along the side of Mr Robert Campbell's premises, with the exception only of the privilege granted to Joseph Walker and partner, by an article of agreement, dated on the 1st of this month, which calls for the space of eighteen yards, along the face of said quarry and near the middle thereof, together with the other conditions contained in said article, the remainder of the face of said quarry to be considered for the use and under the control of the abovementioned Robert Watson and William Booth, for and during the said term of six years, provided they fulfil the following conditions, viz. they agree to pay unto the said O'Hern, his heirs, &c., a quarry rent of 7 cents for every perch of twenty-

[Watson v. O'Hern.]

and three-fourth cubic feet of common building stone they take out, and 4 cents a foot for every foot of cutting stone they may get during said time, the cutting stone to be running measure, for all stone not broader than eighteen inches, and all the stone which shall exceed eighteen inches wide to be cubic measure. They also agree to deposite their stripping regularly, deep on the south side of or front of the quarry, and always keep a sufficient distance clear between the face of the rock and the stripping, for a loaded wagon to pass along. They also engage to fulfil any or all of the contracts the said O'Hern may agree for, in such materials and workmanship as the conditions of such contracts call for; provided always, that such contracts are not undertaken at a lower price, than the established undertakers in this vicinity undertake such work for; say, for instance, Mr Pegan or Mr Smiley, &c.; the said Robert and William, do also agree to render unto the said O'Hern, if required by him, orders on the proprietors of the buildings for the amount which may be coming to him for his claim for the quantity of stone in each contract, as may be conveniently ascertained, and in the space of fifteen days after the stone work is finished. It is also signified and conceded to, that, provided the said Robert Watson and William Booth faithfully fulfil the conditions of this article, they shall have a new lease of the said quarry on as reasonable terms, and in preference of any other new applicants for the said property. The said O'Hern also enjoins on the parties, that no liberties be taken nor injury done to either the pasture or fences of the field in which said quarry is, than strictly what is necessary for taking off the stripping on the same. It is further agreed, that the said Watson and Booth shall be present to give their consent at the closing of any contracts that the said O'Hern shall make. It is further agreed, if Joseph Walker & Co. should at any time give up their bargain in said quarry, that there on conditions, that the said Watson and Booth shall keep four teams constantly at work during nine months every year, that then they shall have the privilege of that part which said Walker's contract calls for, together with their own."

The plaintiff thus assigned the breach of the covenant by the defendants.

By virtue of which articles of lease and agreement before recited and set forth, afterwards, to wit, on the day and year aforesaid, the said defendants went into the possession of, and assumed the control of the said quarry. And the said plaintiff avers that although he hath always, from the time of making the said articles of agreement, hitherto well and truly performed and fulfilled and kept all things therein mentioned and contained on his part and behalf, to be performed, fulfilled, and kept, according to the tenor and effect, true intent, and meaning thereof. Nevertheless, the said defendants, the covenants and agreements aforesaid, in the said articles of agreement contained as herein before set forth, or any

[Watson v. O'Hern.]

of them, on their part to be fulfilled, performed, and kept, have not performed, fulfilled, or kept, according to the tenor and effect, true intent, and meaning thereof, the said plaintiff saith that they did not quarry and haul away all the stone they were able to find use for, during that part of said term of six years, from the 5th day of February 1834, which was expired at the time of the impetration of this writ, but altogether neglected to quarry and haul away and use any stone from same, from the 15th day of May 1834, and previous to the institution of this suit, and neglected to pay any compensation to the said plaintiff, for the stone which they might have quarried, hauled away, and found use for, during said period. And the said plaintiff avers, that the said defendants were able to have found use for, and might have hauled away from said stone quarry a large quantity of stone, to wit:          perches, during said period, which they altogether neglected to do, and which they ought to have done, according to the tenor effect, true intent, and meaning of their covenants aforesaid, and for a further breach of said covenants, the said plaintiff further saith, that he, on the day of May in the year 1834, after the execution of said articles of agreement, and before the institution of this suit, agreed and contracted with          M'Kelvey, for the delivery of as much stone as was necessary for the walling of a certain cellar, and which contract the said defendants, by their covenants with the said plaintiff, were bound to fulfil, and of which they, the said defendants, then and there had notice, and which they altogether refused and neglected to do, and to deliver said stone to the said  .  M'Kelvey, as contracted for by said plaintiff, by reason of which, the said plaintiff saith he is injured and damaged to the value of 500 dollars.

It appeared in evidence, that the plaintiff had recovered damages from the defendants, in a former action, on the same agreement.

The court below, thus charged the jury:

Grier, president.   It is a rule of law, well established, that covenants or contracts are to be construed according to their spirit and intent, and that the spirit and intent are to be gathered from the whole context, and a performance which is strictly according to the letter of the covenant, if it violate the spirit's intent, is as much a breach as if it violated the letter also; and as agreements are often drawn by persons unacquainted with the technical or proper use of legal terms, no precise or formal terms are necessary to constitute a covenant.   Thence the inquiry always is, what was the intention of the parties?   On this subject many examples might be cited, but one or two will suffice. If I covenant to deliver so many yards. of cloth, and I cut it in pieces and then deliver it, it is a breach.   So, if one covenant to leave the trees on the land, and he cuts them down and leaves them there.   So, in the case of Griffith *v.* Goodland, when a brewer covenanted to deliver the grains from his brewery to plaintiff, for seven years, but put hops in the malt,

[Watson v. O'Hern.]

whereby the grains were spoiled.  In an action of covenant, it was objected that it would not lie, because defendant had fulfilled it to the letter by delivering the grains, and that the only remedy for the plaintiff, was an action on the case for fraud; but the court held, that it was the intent that the plaintiff should have the grains for the use of his cattle; of course that he was to have in such a state that his cattle would eat them, that when hops were mixed with grains, cattle would not eat them.  Therefore, though the grains were in fact delivered, so as to comply with the letter of the covenant, they were not delivered in such a state as to comply with the spirit of it, and it was consequently broken and the action maintained

With these principles in view, let us examine this article of agreement, and endeavour, if possible, to arrive at the true meaning, spirit, and intent of it, and having found this, it will be your duty to say whether the defendants have broken their contract, and what damages they should pay for such breach.

The plaintiff is owner of a stone quarry, near Allegheny town, the defendants are stonecutters.  The plaintiff " lets to them, on lease of six years, the privilege of quarrying and hauling away all the stone they may be able to find use for, during the said term of six years, and liberty to quarry the same all over the present face of the quarry, excepting a space of eighteen yards leased to Walker," which is " to be considered for the use, and under the control of" defendants, " during the term of six years," provided, however, that they fulfil the following conditions, viz. " They agree to pay unto the said O'Hern, his heirs, &c., a quarry rent of 7 cents a perch," &c., &c.  They agree, also, to fulfil any contracts O'Hern may agree for, in such materials and workmanship as the conditions of such contract may call for, provided the terms are good and they agree to them.  They agree, also, to give plaintiff orders on proprietors of buildings for amounts due him for rent.  They also agree further, if the reserved part of the quarry, held by Walker, be at any time given up to them, that they will keep four teams constantly employed during nine months in every year.

Now it is contended by the defendants' counsel, that this is the grant of a mere privilege, to be paid for when used, at a certain rate, and that the defendants are not bound to use it; have not covenanted to take out any particular quantity of stone, and that when they see fit to take them they will pay for them.

Now this construction may, in a measure, be according to the letter of this contract, but I think no person of common understanding, would say it is according to the spirit and intent of it.  I may lease a man my mill for a year, and although I may absurdly call it in my lease " privilege of using my mill for a year, and grinding all the grain that may come to it," and may forget to insert in it a covenant that the lessee shall keep it going day and night, but only bind him to give me a share of the tolls, yet I think he could

[Watson v. O'Hern.]

hardly be called an honest man, who, with such a contract, would shut up my mill and put the key in his pocket, and when called on for rent, turn on his heel and say, I covenanted to pay you a share of the tolls; I have taken none; go about your business; when I take any I will pay you your share.

But is this a mere privilege?  Although called a privilege of quarrying and hauling away all the stone the defendants may be able to find use for, yet it is a lease for six years, defendants are to have the use and control of the quarry for six years; it is in fact nothing more nor less than a lease of the quarry, uninstructed as to the quantity of stone to be taken from it; the phrase " may be able to find use for," will include as many as they can dispose of to advantage.   The parties evidently contemplate that stone will be supplied to contractors or builders of houses; and as the quarry was nigh to a large and growing city, they seem to take it for granted, that both parties would be anxious to dispose of as many as possible, as it would be to their mutual advantage.

Now, if the defendant had shown that he got out as many stone as he could dispose of; that he had but a single team and did as much as he could; that he could not get hands to quarry; or any other reasonable excuse for not doing as much as plaintiff might expect or demand, he might well say, I have done all I was able, and I have not contracted to do more; I have not bound myself to keep any certain number of teams going.   Or if they had said to plaintiff, we find ourselves unable to go on with this business, here is your lease, do the best you can; they might justly have called upon you to give nominal, or no damages at all, especially if plaintiff had refused to accept his lease again, knowing they could not go on with the business.   But it seems, that when at the arbitration in the former suit, the plaintiff complained they would not give up the lease, the defendants did not offer to give it up except upon conditions which they evidently had no right to require.

It has been objected that a second suit will not lie on this agreement; that as no time is fixed for payment of rent, plaintiff might bring an action every day, either for an account, if not rendered, or for a breach, if the quarry is not used; that, because this would be so unreasonable, therefore, the contract is satisfied by one recovery for a breach of it.   But although it would be unreasonable and oppressive to have a great number of suits, it does not follow, that, therefore, the plaintiff shall have but one; or that, because the parties have fixed no time for rendering an account or paying rent, therefore, plaintiff should wait till the end of the term.   The parties evidently understood that the quarry rent should be paid along as the money for the stones sold was got; that the plaintiff should have an order on the purchasers or proprietors of houses for which they were furnished.   While the court will hinder the plaintiff, on proper application made, from oppressively multiplying suits, or would consolidate them and make him pay

[Watson v. O'Horn.]

the costs of all but one; so they will not permit the defendant to trifle with his contract, and escape doing what is just and equitable, by quibbles upon the words of his contract.

It is urged, also, that as the defendants had not covenanted to get out any particular quantity of stone, or to keep any set number of teams employed, therefore, as they had fixed no certain rule of damages, the jury can give none, or at least, but nominal damages. But this is not correct, as I have already shown the spirit and intent of this agreement is, that defendants should go on to quarry stone and dispose of them; the plaintiff is not bound to show how many might have been sold, or that defendants bought other stones, during the time for which damages are now claimed, and that plaintiff should recover just what he would have had, if defendants had taken the same quantity from his quarry. The defendants have wholly refused to quarry stones; have made no attempt to an honest performance of the spirit and intent of their contract; the testimony produced by them on the trial, for the purpose of excusing themselves or throwing blame on the plaintiff, is too palpably absurd to be noticed. The jury are, therefore, to judge of what injury the plaintiff has received, by the non-performance of this contract, and not let the defendants escape altogether, by their palpable evasion, because the contract has established no exact measure of damages.

On this subject the court can only say, defendants had not covenanted what quantity shall be got out, or how many teams were to be employed; nor although witnesses have stated that the defendants stated they intended employing their teams, are they bound to that as a measure of liability.

The defendants owned one team, they used it for a time, and afterwards sold it, and ceased to go on with their contract altogether. If they had gone on with that, hauling ten or twelve perches a day, perhaps the jury may think they would have been excused if they could have done no better. It is true it may be said, the plaintiff has his stones, and they are worth as much now as ever; but although that is true, as a general proposition, it might lead to a false conclusion, as is most evident. It will be for the jury, therefore, to say what damages the plaintiff has sustained, by the total refusal of these defendants to attempt any sort of compliance with the spirit and meaning of their contract, from the 25th of June 1834, to the 5th of February 1835.

To which charge of the court, the defendants' counsel excepted.

Verdict for plaintiff, for 170 dollars, damages.

*Stewart*, for plaintiffs in error.
*Shaler* and *Livingston*, contra.

The opinion of the Court was delivered by

SERGEANT, J.—It is contended that by this instrument of writing

[Watson v. O'Hern.]

the plaintiff granted and the defendants obtained nothing more than a privilege to take stone from the quarry, which they might or might not avail themselves of at pleasure, and that they were not bound to take out any stone except what the plaintiff should contract for, agreeably to the stipulation in his favour.   I am disposed to think, however, that something more passed to the defendants than such a right, and that the defendants obtained, under this instrument, the exclusive right to the use, occupation and enjoyment of the demised premises during the term.   The plaintiff certainly could not afterwards have granted to other persons a privilege, as it is termed, or right to enter and quarry the stone.   The defendants might well have complained of such an attempt, and might have sustained trespass against any person exercising the right thus claimed.   If the right of the defendants were not exclusive, it might be rendered, in a great measure, valueless by the plaintiff's acts. It appears to me to be exclusive, conferring on the defendants the sole right, making them owners during the term, constituting, · in legal contemplation, a lease to them of the demised premises, with the relations and liabilities between the parties, of landlord and tenant.   In the instrument itself different words are used to express the nature of the contract.   In one part, the premises, it is said, are to be for the sole use and under the control of the defendants during the term.   If they fulfil the conditions, they are to have " a new lease of the quarry, in preference to any new applicant."   Walker's part is in one place termed a privilege, and yet it is scrupulously excepted.   In another part it is called his bargain in the quarry, and also his contract.   It is an established rule of law, that, whatever words are sufficient to explain the intent of the parties, that the one should divest himself of the property and the other come into it for a determinate time, whether they run in the form of a license, covenant or agreement, will, in construction of law, amount to a lease as effectually as if the most proper and pertinent words were made use of for that purpose.   4 *Bac. Abr.* 161, *tit. Leases, K.*   A license to inhabit amounts to a lease.   *Ibid.;* 11 *Mod.* 42; 1 *Ld. Raym.* 404.   A license to enjoy a house or land from such a time to such a time, is a lease, and ought to be pleaded as such, though it may be pleaded as a license.   *Ibid.;* 2 *Salk.* 223.   Words in an agreement that A shall hold and enjoy, if not accompanied by restraining words, operate as words of present demise.   5 *Term Rep.* 163; *Cro. Jac.* 172; 2 *Mod.* 80.   If a grant be made of a boilery of salt, the land passes; for that is the whole profit.   *Co. Lit.* 46; *Woodf. Land. & Ten.* 5, 7, 8.   The whole profit of a quarry consists in the right of taking out the stone, and by a grant of all that right or privilege the land passes, in the same manner as land passes by a grant of all the rents and profits.

Then it is clear the parties contemplated that the quarry should be worked by the defendants to some extent, and not lie idle and unproductive to the landlord: and that extent is declared to be so

[Watson v. O'Hern.]

much stone as the defendants should be able to find use for. They are described as stonecutters, and in the course of their trade the parties must have presumed they would find occasion for a supply of more or less of the stone. The exact amount they would be able to dispose of could not be ascertained beforehand, because it must depend on the growth of the city and neighbourhood and the consequent demand for the material. But that there would be no demand at all was not to be supposed, nor did the defendants attempt to show that to be the case. They were, therefore, free from any obligation to quarry stone from the premises, except so much as they should be able to use, or, in other words, find demand for in their business. It would surely be a violation of the meaning and design of the lease, if they should leave the quarry entirely idle, either to work some other quarry, or for any reason short of what would legally excuse them. There is abundant evidence in the language of the lease to show that the parties contemplated the quarry should be worked. The exception of the part leased to Walker; the adjustment of the rent according to the measure of the stone taken out; the clause relating to the place of deposit of the stripping; the agreement to furnish orders on the proprietors of buildings for the plaintiff's proportion within fifteen days; the restriction of injury to the plaintiff's pasture and fences, all contemplate a working of the quarry. The exact extent is ascertained only in one event, and that was, if the defendants required Walker's part, and then they bind themselves to keep four teams constantly at work during nine months of the year.

The clause by which the defendants covenant to fulfil contracts to be made by the plaintiff, seems to be only an additional obligation on the defendants, and not to comprehend all that they were bound to do. Such a construction is irreconcilable with the tenor of the agreement, especially with the clause by which the defendants stipulate to furnish to the plaintiff orders on the proprietors of buildings for his amount of claim on each contract, which evidently refers to contracts made by the defendants.

If the defendants had any excuse, legal or equitable, from the responsibility thus assumed by their agreement, it lay upon them to show it. The plaintiff was not bound to prove the extent of their capacity to fulfil the contract. The lease presupposes they would work the quarry, and gives them the entire control over the premises; and being themselves acquainted with their own business and concerns, they were best able to show the extent to which they were able to work it; or if not worked at all, the reasons for their inability. Not having done so, it was for the jury to give such damages as they might deem a compensation for the loss of rent. There is, therefore, no error in the charge of the court on this subject.

Nor is the *third* error sustained. This action is for damages for nonpayment of rent, and a former recovery for one part of the term

does not preclude a suit for other damages sustained by the lessee's nonpayment of rent during another period of the term for which he was liable. Though the instrument sued on is the same, the causes of action are different.

Judgment affirmed.