# Koch's and Balliet's Appeal.

1. Where the right to mine ore or other minerals is granted in consideration of the reservation of a certain proportion of the product to the grantor, the law implies a covenant on the part of the grantee to work the mine in a proper manner and with reasonable diligence, so that the grantor may receive the compensation or income contemplated when the agreement was entered into ; but unless there are special reasons for equitable interference, such covenant will not be enforced in a court of equity, as an adequate remedy is afforded by an action at law for damages.

2. A. covenanted with B. that the latter should have the exclusive right to mine the iron ore on A.'s land, one-sixth thereof to be paid to A. The mining was carried on for some years, when B. suspended operations. A. then filed a bill in equity to compel B. to proceed with the mining or to deliver up the contract for cancellation, and the court made a decree accordingly, and awarded damages. *Held*, that this was error ; that there was no jurisdiction in equity, as an action at law for breach of covenant would clearly lie.

March 5th 1880. Before SHARSWOOD, C. J., GORDON, PAXSON, TRUNKEY and STERRETT, JJ. MERCUR and GREEN, JJ., absent.

Appeal from the Court of Common Pleas of *Lehigh county :* Of January Term 1877, No. 174½. In Equity.

Bill in equity filed by Benjamin Guth and others, heirs and administrators of Daniel A. Guth, deceased, against John Koch, Sr., Lewis B. Balliet, executor of Stephen Balliet, deceased, and Edward H. Balliet and others, heirs of said Stephen Balliet, deceased.

The bill was filed March 3d 1873, and alleged, in substance :

1. That on August 23d 1842, Daniel A. Guth, since deceased, entered into an agreement with Christian Pretz and others, as follows : " For the consideration hereinafter mentioned, the said

party of the first part hereby covenants, grants and agrees, to and with the said parties of the second part, that he, the said party of the first part, will, and does hereby grant, permit and allow the said parties of the second part, their heirs, executors, administrators and assigns, the exclusive right and privilege to open pits, sink shafts, mine and make all necessary work for mining and for mining purposes, in or upon all or any part of all that tract or parcel of land owned by said party of the first part, situate in the township of South Whitehall aforesaid, for the purpose of digging and mining iron ore, and all other kinds of minerals and ores, and to mine, dig, take away from said land, sell, use and dispose of iron ore, and all other kinds of minerals and ores. The said parties of the second part, their workmen and laborers, to do as little damage to the land, wood growing thereon and premises, as the nature and proper prosecution of the proposed undertakings will permit. In consideration whereof, the said parties of the second part, promise and agree to give and to deliver to. the said party of the first part, or to his heirs, executors, administrators or assigns, the one-sixth part of all the iron ore, and of all other ores and minerals, which they, the said parties of the second part, their heirs, executors, administrators or assigns, may move, dig or cause to be moved or dug from, in or upon the said land, the one-sixth part to be delivered at the mouth or mouths of the pit or pits, free and clear of all expenses to him, the said party of the first part, his heirs and assigns. The remaining five-sixths parts of all the aforesaid ores and minerals to belong to and be the property of the said parties of the second part, their heirs, executors, administrators and assigns. And the said party of the first part further agrees, that the parties of the second part may, if they deem necessary, erect one or more buildings for the accommodation of those employed in the mines upon said land, provided, that if at any time the said parties of the second part, their executors, administrators or assigns shall finally abandon the working of said mines, the said party of the first part shall have the first chance to purchase such buildings, and if a price cannot be agreed upon, then said building or buildings shall, at the expense of the said parties of the second part, their executors, administrators or assigns, be removed from said lands. And, it is further agreed, that if limestone shall be mined or quarried upon said lands by the said parties of the second part, their executors, administrators or assigns, they may sell the same, paying one-sixth part of the proceeds of sale to said party of the first part, his heirs or assigns."

2. That on the 5th of December 1851, the parties of the second part in the above agreement, assigned and transferred to John Koch, Sr., and to Stephen Balliet, now deceased, all their rights and privileges under said contract.

3. That under and in pursuance of the aforesaid contract, and

in carrying out its object—the mining and raising of iron ore and other ores and minerals—John Koch, Sr., and Stephen Balliet, and his legal representatives, built, erected and maintained extensive machinery and improvements, and sunk pits and shafts for mining purposes, and for thirty years or more, dug, mined, raised and disposed of large quantities of iron ore, paying to the persons entitled thereto the one-sixth part of said ores, averaging about $3500 annually.

4. That about the 1st of April 1872, the respondents, without any cause, and in violation of the terms of the aforesaid contract, entirely ceased and abandoned the digging, mining and raising of iron ore, and other ores and minerals, upon the said premises, and the delivery of any portion thereof to complainants, and have persistently and without cause, ever since said date, continued their abandonment, by reason whereof your orators are deprived of all income and rental from said lands.

5. That although repeated offers have been made by responsible parties to the respondents to work and operate the said mines on terms as favorable to the respondents as can reasonably be had, all such offers have been refused; and notwithstanding complainants have often requested and notified the respondents to resume said mining operations, or surrender or rescind the aforesaid contract, they have refused, and still refuse, to comply. And your orators aver that they are informed, and believe, that respondents do not intend to carry out the purposes and intentions of the said contract.

6. And further, that there is on said described tract of land a large and valuable bed of iron ore, which can be profitably worked.

In consideration whereof, and as complainants can have no adequate remedy at law, they pray that the court may decree and direct " that the aforesaid respondents, within as reasonable time as to the court may seem meet and proper, shall proceed to dig, mine and raise iron and other minerals upon said land, and deliver the one-sixth part thereof to complainants, according to the spirit and intent of the said contract or agreement; or, in default thereof, to cancel, rescind and deliver up the aforesaid contract or agreement."

The respondents demurred to the bill on the ground that the complainants had an adequate remedy at law.

The court overruled the demurrer, when respondents filed an answer, which (1) admitted the first and second paragraphs of the bill to be substantially true, but averred that on the 2d of March 1848 there was executed a supplemental agreement between Daniel A. Guth and C. Pretz, as agent and partner of the Guth Mining Company, wherein it was stipulated that as the mining company had built certain buildings on the lands, it was agreed that Guth should pay one-half the taxes; that the company should pay Guth

rent for the land on which the buildings were erected, and the gardens attached thereto ; that if the ores should become exhausted, or the company at any time should see fit to surrender its lease, and the parties should fail to agree upon the price at which Guth should take said houses, that they should resort to a method of appraisement which was set forth in the agreement. And the answer averred that this supplemental agreement was included in the transfer alluded to in the second paragraph of the bill.

2. The answer admitted the mining and raising of iron ore by respondents' sub-tenants and lessees, mentioned in paragraph third of plaintiff's bill, but they denied that they worked said mine thirty years, and denied the sum of $3500 averaged annually.

3. It denied the matters alleged in paragraph four, and averred that respondents never abandoned the said mines, but leased the same to the Crane Iron Company in the year 1852, and the said company operated and worked the mines until 1872 ; that long before the expiration of the said lease, the respondents tried all means of an extension of said lease, and to lease to other parties, as is set forth in the answer.

4. It denied generally the matters set forth in the fifth and sixth paragraphs of the plaintiff's bill.

5 and 6. It denied the right of the plaintiffs to maintain their bill, and asked that it might be dismissed.

A general replication was filed, and the court referred the case to T. B. Metzger, Esq., as master, who took a large amount of testimony in support and denial of the allegations of the bill and answer, and then reported a decree dismissing the bill, on the ground that the complainants had an adequate remedy at law. Exceptions were filed by complainants, and after argument the court again referred the case to the master, "with instructions to entertain the complainants' bill, to consider and marshal the testimony, and report the findings of fact, as required by the rules of equity practice, to determine and assess the damages, and to report a form of decree."

The master filed a second report, wherein he found as follows :

"The facts proven in this case are these :

"1. The original writing between Daniel A. Guth and Christian Pretz, et al.

"2. The assignment of this writing to Koch, Sr., and Stephen Balliet, now deceased, by Christian Pretz et al.

"3. The working of the Guth mines, in connection with the Koch and Balliet mines, by the Crane Iron Company, up to April 1872, under lease from Balliet and Koch for a term of twenty years.

"4. That the income of the Guth heirs was nearly, if not quite, $3500 a year ; and that the yield of ore from their mines was on an average six thousand tons per year, of which the complainants,

were entitled to the sixth ton of merchantable ore, delivered at the pit or pits, under the original writing between D. A. Guth and C. L. Pretz, George Probst et al.

"That the complainants have proved a refusal on the part of the respondents to extend this same lease, viz.: the lease of Crane Iron Company with Koch, Sr., and Balliet, now deceased, sometime before the original lease expired; but they have not proven the fact, that the respondents neglected, refused or were indifferent to a leasing of these same premises to parties other than the Crane Iron Company. On the contrary, it is established by indisputable testimony, that the respondents made diligent endeavor to lease these premises to others, immediately after the expiration of the six months, which the Crane Iron Company had for the removal of their machinery.

"The measure of damages would be the price of ore per ton from November 1872, to the time of final decree.

"The testimony is, that the yield of ore would have continued the same. This being so, the Guth heirs would have been entitled, and would, in case this present finding of facts is not sustained, be entitled to one thousand tons per year, at the prevailing prices which were to be from $3.50 to $4.00 per ton. I cannot fix this rate more accurately, because no more accurate standard is fixed by the testimony. This disposes, I believe, of all questions, and complies fully with the directions of your honorable court.

"In view of these findings, I again respectfully submit the decree reported by me heretofore."

Both complainants and respondents filed exceptions to this report. The court, Longaker, P. J., filed an opinion and made a decree: "That within thirty days from this date, the defendants pay unto the plaintiffs the sum of $8615.10, with interest from January 1st 1877; and that within the same period, they proceed, with diligence and in a reasonable and proper manner, to prosecute the work of digging, mining and raising iron ore upon and from the premises, in such quantities as the capacity of the mines and the quantity of ore upon the premises will warrant; and that they deliver to the complainants, at the pits' mouths, the one-sixth part of the ore so mined, free and clear of all expenses to the complainants. And that in case of the failure or default, on the part of the respondents, to comply with and perform the directions of the foregoing decree in every particular; then, that within five days after the expiration of the aforesaid thirty days, the respondents rescind, cancel and deliver upon to the complainants, the contract or agreement."

From this decree the defendants took this appeal, alleging that the court erred in overruling the demurrer and in entering the above decre

[Koch's and Balliet's Appeal.]

*John D. Stiles* and *Morris L. Kauffman*, for appellants.—The demurrer and the answer both deny that equity is the proper remedy. The jurisdiction is given under art. 6, sec. 2 of the Act of 1836, "affording specific relief when a recovery in damages would be an inadequate remedy," or it does not exist.

It does not confer universal, or even general, equity powers. There must be no adequate remedy at law. Equity jurisdiction is limited in this state. There is nothing contrary to law in refusing to carry out the terms of a contract; and damages cannot be decreed in equity for a breach. The limited chancery powers of our courts extend only to prevent acts contrary to law: Hagner *v.* Heyberger, 7 W. & S. 104. An action of a purely equitable nature cannot be maintained for the purpose of giving damages: Von Beck *v.* Village of Rondout, 15 Abbott (N. Y.) Practice 48; Stevenson *v.* Buxtar, Id. 352; Kauffman's Appeal, 5 P. F. Smith 383.

To justify the cancellation of a contract requires a stronger case than is required to resist a specific performance: Brainard *v.* Holsaple, 4 Green (Iowa) 485. Equity will not order an instrument to be delivered up or cancelled except in a very clear case. If a defendant may possibly have any rights under it, the parties will be left to their remedy at law: Stewart's Appeal, 28 P. F. Smith 838. The rescission of an executed contract will not be decreed except on proof of fraud or mistake: Graham *v.* Pancoast, 6 Casey 89; Nace *v.* Boyer, Id. 99; Davidson *v.* Little et al., 10 Harris 245; Geddes's Appeal, 30 P. F. Smith 442.

The agreement of 1842 was a grant of the ore in place: Caldwell *v.* Fulton, 7 Casey 480; Clement *v.* Youngman, 4 Wright 345; Barker *v.* Dale, 3 Pitts. R. 190.

*R. E. Wright & Son* and *Edward Harvey*, for appellees.— Where there is a lease of an ore mine, or the grant of a right to mine ores, and the consideration of the grant or the rental reserved is a certain proportion of the ores mined or a royalty thereon, the law implies a covenant upon the part of the lessee to work the mines with diligence and in a proper manner, so that the grantor may receive the return contemplated in the lease or grant: Sharp *v.* Wright, 28 Beavan 150; Bainbridge on Mines, 1st Am. ed., b. 214; Shrewsbury *v.* Gould, 2 B. & Ald. 487; Brainerd *v.* Arnold, 27 Conn. 617; Lyon *v.* Miller, 12 Harris 393; Watson *v.* O'Hern, 6 Watts 362. In Pennsylvania it has been held that it is not merely where there is a remedy at law of some kind that a bill in equity will not lie, but the remedy must be full, complete and adequate. Where the damages recovered in an action at law would not be a complete compensation, or the amount could not be certainly fixed, or where the remedy at law would result in a

multiplicity of suits, it has frequently been held that the remedy at law is not complete and adequate, and that parties may resort to a court of equity, where a decree can be framed so as to prevent future litigation, and fix permanently the rights of all parties concerned: Brainerd v. Arnold, *supra;* Finley v. Aiken, 1 Green 84; Brightly's Eq. 247, 609; 1 Story's Eq., ch. 4, sect. 47; ch. 14, sect. 80; Bank of Kentucky v. Schuylkill Bank, 1 Pars. 180; Bank v. Adams, Id. 537; McGowin v. Remington, 2 Jones 56; Campbell's Appeal, 30 P. F. Smith 311.

The appellants, instead of honestly proceeding to operate the mines, refused, for a period of nearly six years, to perform their covenant, thus depriving the appellees of a large income to which they were clearly entitled, and making a fraudulent and unfair use of the contract. And if the appellants decline, in obedience to a decree of the court below, specifically to perform their implied covenant, but persist in holding the lease without performance, then a court of equity will not hesitate to order its cancellation at the suit of the lessors: Duncan's Appeal, 7 Wright 67; Wilson et al. v. Getty et al., 7 P. F. Smith 266; Hetrick's Appeal, 8 Id. 477; Lippincott v. Whitman, 2 Norris 244; Souders's Appeal, 7 P. F. Smith 498; Coleman's Appeal, 25 Id. 441; Wilhelm's Appeal, 29 Id. 121.

Mr. Justice STERRETT delivered the opinion of the court May 3d 1880.

The agreement which forms the basis of claim in this case was made in August 1842, by and between Daniel A. Guth, of the one part, whose interest therein is now represented by the appellees, plaintiffs below, and Christian Pretz and others, parties of the second part, to whose rights, duties and obligations the appellants succeeded by virtue of sundry assignments of the agreement. Guth, being then the owner of the land, covenanted and agreed with the "parties of the second part, their heirs, executors, administrators and assigns, to furnish and allow them * * * the exclusive right and privilege to dig, mine and take away all iron ore and all other minerals which are or may be found in or upon the land" described in the agreement; "and for that purpose to open pits, sink shafts, and to make and erect all necessary works for the purpose of digging and mining said ore and minerals and taking the same from said land," &c. In consideration whereof the parties of the second part covenanted and agreed "to deliver to the said party of the first part, or to his heirs or assigns, the one-sixth part of all the iron ore and of all other ores and minerals which they * * * may mine or dig, or cause to be mined or dug, in or upon said land. The said one-sixth part to be delivered at the mouth or mouths of the pit or pits free and clear of all charges and expenses to the said party of the first part," &c. "It being

agreed and understood by all the parties that the remaining five-sixths part of all said ores and minerals shall belong to and be the property of the said parties of the second part, their heirs, executors, administrators and assigns." This was followed by a supplemental agreement, made in March 1848, by which it was provided that each party should pay one-half of the taxes; that the grantees should pay a certain rent for land occupied by their houses, stables, &c.; and, in case the mines should become exhausted, or the grantees should "for any other cause see fit to surrender and give up their lease of said mines," provision is also made for valuing and disposing of the houses, stables, &c.

The bill charges that, in pursuance of the agreement, the mines had been successfully worked for many years, and yielded a large income to the plaintiffs; that, on or about April 1st 1872, the defendants, "without any cause whatever, and in violation of the terms and spirit of the aforesaid contract and agreement, entirely ceased, suspended and abandoned, or caused to be suspended and abandoned, the digging, mining and raising of iron ore and other ores and minerals upon the said premises, * * * and have persistently, and without cause, ever since continued their abandonment and suspension of the mining, digging and raising of said iron ore and other minerals;" and then concludes with a prayer for a decree that the defendants shall, within a reasonable time, proceed to work the mines and deliver one-sixth of the ores and other minerals mined to the plaintiffs, according to the spirit and intent of the agreement; or, in default thereof, cancel, rescind and deliver up the contract, and for "such further relief in the premises as may seem agreeable to equity and good conscience."

The master very properly found that the mines had not been actually abandoned by the defendants, nor had anything been done that amounted to an abandonment. While it was shown that they had declined to extend the lease of the Crane Iron Company before it expired, and did not afterwards work the mines themselves, the master finds that immediately after the expiration of that lease they made diligent but unsuccessful efforts to lease the mines for the purpose of mining. They may perhaps have failed to comply with the terms of the agreement according to its true intent and meaning, but there was nothing done or omitted to be done that would justify the cancellation of the agreement. At most, they rendered themselves liable to damages for neglect to work or cause the mines to be worked. While the rights granted are without limit as to time, and the agreement contains no express covenant as to how the mines shall be worked, or that any specified amount of ore shall be taken out, it does not follow that the appellants were at liberty to operate the mines or not as they saw fit. It was evidently the intention of the parties that they should be worked with reasonable diligence, and that would depend largely on the

circumstances.   The quantity and quality of the ore, and the demand that existed from time to time, would necessarily enter more or less into the question of due diligence.   If the ore proved to be abundant and of good quality, and the demand was such as to justify a vigorous prosecution of the work, the spirit of the agreement manifestly required that it should be so worked.   Where a right to mine iron ore or other minerals is granted, in consideration of the reservation of a certain proportion of the product to the grantor, the law implies a covenant on the part of the grantee to work the mine in a proper manner and with reasonable diligence, so that the grantor may receive the compensation or income which both parties must have had in contemplation when the agreement was entered into.   This principle appears to be recognised in Watson *v.* O'Hern, 6 Watts 362, and Lyon *v.* Miller, 12 Harris 392.   In the former, a lease of a stone quarry in consideration that the lessee should pay a certain price per perch for all the stone taken out, was held to be a contract on his part that he would work the quarry, and, upon his failure to do so, the lessor might maintain covenant, and recover damages.   It is there said, " If the defendants had any excuse, legal or equitable, from the responsibility thus assumed by their agreement, it lay upon them to show it. The plaintiff was not bound to prove the extent of their capacity to fulfil the contract.   The lease pre-supposes they would work the quarry, and gives them the entire control over the premises; and, being themselves acquainted with their own business and concerns, they were better prepared to show the extent to which they were able to work it, or, if not worked at all, the reasons for their inability.   Not having done so, it was for the jury to give such damages as they might deem a compensation for the loss of rent."

Assuming then that appellants neglected and refused to work the mines with reasonable diligence, it is very clear that the appellees had a complete and adequate remedy at law for the recovery of such damages as they may have sustained.

There was no allegation of fraud, accident or mistake in the procurement or execution of the agreement, nor was there anything alleged or shown that would justify a mandatory order on the appellants, requiring them to proceed and prosecute the work of mining within a specified time, on pain of forfeiting their rights under the agreement.   Nor could it be justly claimed that by proceeding in equity a multiplicity of suits would be avoided.   While the agreement remains in force, the right of action must necessarily depend on breaches of its provisions, and *non constat* that any will occur hereafter.   The only claim that has been made and sustained with any degree of success is the demand for damages resulting from a breach of the agreement, and for that there was no doubt an adequate remedy at law.   Where proper ground for equitable relief is laid and sustained, and jurisdiction has thus attached,

courts of equity will proceed to award compensation or damages where they are incidental to such relief, but not otherwise. We think the conclusion reached by the master in both of his reports, that the bill should be dismissed, was correct.

> Decree reversed and set aside; and it is now ordered and decreed that the bill be dismissed, and that the appellees pay the costs, including the costs of this appeal.