SHARP v. BEHR et al.

(Circuit Court, E. D. Pennsylvania. August 12, 1902.)

No. 22.

1. EQUITY—EVIDENCE TO OVERCOME ANSWER—TESTIMONY OF WIFE.
   Under the law of Pennsylvania, the testimony of a wife, supporting that of her husband, to a fact denied by the answer, is entitled at least to the weight of a corroborating circumstance, which is sufficient to satisfy the equitable requirement.

2. REFORMATION OF CONTRACT—MISTAKE—LACHES.
   One who seeks to reform a contract on the ground of mistake should act promptly, and, if there is any great delay, he is called upon to explain and excuse it. Lapse of time is a serious obstacle to the attainment of truth, and parties are entitled to its quieting effect on possible litigation.

3. SAME—CONSTRUCTION.
   Plaintiff was superintendent of a garnet mine belonging to the defendants, and was himself the owner of another mine adjoining, which he was induced to convey to them. As part of the consideration, he claimed that he was to be retained in his position as superintendent, for 20 years, at a salary of $20 a week, which he was then receiving. This was not expressed in the written agreement between the parties, and, according to the preceding parol understanding set up, he was merely to be retained, at the salary he was then receiving, for a term of years to be afterwards agreed upon. Held, that this was too indefinite and incomplete to warrant a reformation of the contract; nor was it helped out by a provision in the contract that the royalties on ore mined there stipulated for should continue for the term of 20 years, unless the plaintiff should voluntarily leave his employment; nor by the further provision that they should be paid to his wife at a reduced rate—one-half—in case of his death during that period.

4. CONTRACT TO PAY ROYALTY ON ORE MINED—CONSTRUCTION.
   By a written contract plaintiff agreed to convey to defendants a farm on which was a garnet mine, and which adjoined property on which defendants were also working mines. In part consideration for the conveyance defendants stipulated to pay plaintiff for a term of years a royalty "upon

all ore shipped by them" from their mines in the township, including not only the mines then operated by them, but also from the mines on the property conveyed, "if possession thereof be obtained" by them. The mines on the property conveyed were then leased, the lessee having an option to renew, which he exercised, and defendants did not obtain possession, but received only the royalty from the lessee. *Held* that, under the terms of the contract, the obligation of defendants to pay royalty on ore from the farm purchased was conditioned on their obtaining possession of the mines thereon, and that under the facts stated they were not liable for such royalty.

5. CONTRACTS—CONSTRUCTION BY PARTIES.

The construction of. a contract which is plain and unambiguous cannot be affected by voluntary payments made by one party thereunder through mistake, and which were clearly not required by its terms, and were not demanded by the other party, although, had they been required by the contract, they would have been in arrears for over three years.

6. MINING—CONTRACTS FOR ROYALTY—IMPLIED CONDITION TO OPERATE MINES.

Plaintiff conveyed certain property to defendants, in consideration of which they contracted to pay him a royalty on all the ore shipped from their mines in the vicinity during a term of 20 years, the right to which, however, plaintiff should forfeit if he voluntarily quit defendants' employment during such term. *Held*, that it was an implied condition of such contract that defendants should continue to operate their mines with reasonable diligence during the term, and that their ceasing to operate the same was a breach of such condition, for which plaintiff was entitled to recover damages.

7. SAME—FORFEITURE FOR NONPAYMENT—COST OF PROPERTY TO BE REPAID ON RECONVEYANCE.

In case of failure by the defendants to pay royalties for 90 days after written demand, the plaintiff had the right to call for a reconveyance of the mine, which he had conveyed to them, upon repaying the cost price. The money consideration named in the agreement was $1, but the real cost to the defendants was $3,500, made up of incumbrances on the property and obligations of the plaintiff, which they took care of for him at the time. *Held*, that the tender of $1 was insufficient, and that the plaintiff must repay the $3,500.

8. SAME—ROYALTY PER TON—DOCKAGE OR DEDUCTION FOR INFERIOR QUALITY

The defendants, having stipulated to pay a royalty of $1 per ton on ore mined and shipped, had no authority to reduce this amount on account of the inferior quality of the ore, the royalty being measured by the quantity, and not by the quality; nor, although the royalty was, no doubt, to be calculated on refined or cleaned ore, had they the right to make a deduction or dockage on the quantity, provided the ore shipped had been treated to the usual process of cleaning.

In Equity. Hearing on bill, answer, and proofs.

A. B. Geary and W. B. Broomall, for complainant.

R. C. Dale, for defendant Robert Behr.

ARCHBALD, District Judge.[1] In September, 1891, the defendants were the owners of a garnet mine on what was known as the "Lancaster Farm," in Delaware county, Pa., and the plaintiff, who was their superintendent, had acquired a similar mine on the Fulton farm, adjoining. Both mines were in operation, the one by the defendants themselves, and the other by a tenant, who was in possession under the plaintiff, paying royalty. In order to control both mines and have the plaintiff's undivided interest and services, Mr. Herman Behr, one of the defendants, approached him with a proposition to buy the

[1] Specially assigned.

Fulton farm, which resulted, September 26, 1891, in a written agreement as follows:

"Memorandum of agreement made this twenty-sixth day of September, 1891, between George W. Sharp, of the one part, and Herman Behr, Robert Behr, and Gustav Heubach, trading as Herman Behr & Co., of the other part.

"First. George W. Sharp agrees to convey to Herman Behr & Co., for the consideration of one dollar, the premises described in a deed bearing date June 17, 1891, and recorded in the office for recording deeds for Delaware county, in Deed Book 11, No. 7, page 238, made by James Fulton to George W. Sharp.

"Second. In consideration of said conveyance, Herman Behr & Co. agree to pay to George W. Sharp a royalty of one dollar per ton of 2,240 pounds upon all ore shipped by them from their garnet mines in Bethel township, Delaware county, Pennsylvania, including not only the mines now owned or operated by Herman Behr & Co., but also the mines situated upon the property above mentioned, if possession thereof be obtained by Herman Behr & Co. The amount of shipments to be determined by the railroad shipping receipts.

"Third. The payment of royalties as above to continue for the term of twenty years, unless George W. Sharp shall voluntarily leave the employment of Herman Behr & Co. In case the said George W. Sharp shall die during the said period of twenty years, the royalty shall be reduced to fifty cents per ton, and shall be paid to the wife, Martha Sharp, so long as she may live, and no longer.

"Fourth. In case Herman Behr & Co. should at any time fail to pay the royalty for a period of ninety days after written demand for the payment of the same has been duly made of Herman Behr & Co., then Geo. W. Sharp shall have the right to demand a reconveyance of the premises mentioned in the first article of this agreement upon his paying to Herman Behr & Co. the cost price thereof."

The plaintiff contends that this does not express all that was agreed to upon that occasion; that according to the preliminary parol understanding, which the written agreement was supposed to represent, he was to be continued by the defendants in the same capacity, as superintendent, for 20 years, at a salary of $20 per week, the wages he was then receiving; and, having been discharged by them in May, 1899, after they had stopped mining, he asks to have the written agreement reformed and enforced accordingly. The defendants deny that there was any such oral agreement, and maintain that the writing expresses the full understanding between them. This raises the first question to be disposed of.

According to the plaintiff's testimony, the proposition made to him by Mr. Behr was in these terms:

"He said: 'If you will transfer that property to us, we will then pay you a royalty of one dollar a ton for all ores shipped from our mines in Bethel township, not only the mine that is now operated by Herman Behr & Co., but also from the Fulton farm,' together with my salary,—my present salary, —'for a term of years to be agreed upon. And,' he says, 'if you die during that term, I will pay to Mrs. Sharp fifty cents a ton so long as she lives; but,' he says, 'if you leave our employ during that term, that contract is null so far as you are concerned.'"

This, at the suggestion of Mr. Behr, was repeated to Mrs. Sharp, who testifies that the proposition was thus stated to her by him:

"Mrs. Sharp, we propose to pay Mr. Sharp a royalty of one dollar per ton for all ores shipped from our mines in Bethel township, not only the mines

now owned and operated by Herman Behr & Co., but also on the Fulton farm, when you and Mr. Sharp deed that property to us, along with his present salary for a term to be agreed upon."

Mr. Behr admits the interview with Mr. Sharp, but gives a considerably different version of it, in which no allusion is made to the matter of continuing his salary. As to Mrs. Sharp, he says he does not recall seeing her at all, and is sure he never said anything to her about the arrangement made with her husband, although he admits that he told the latter to talk it over with his wife.

No objection seems to be made to the quality of this proof,—that, being the testimony of husband and wife, it is equivalent to but one witness. It was formerly so held (Sower v. Weaver, 78 Pa. 443); but, according to the present more enlightened view of the law, it is now considered otherwise (Brenneman v. Rudy, 8 Pa. Dist. R. 68; Guernsey v. Froude, 13 Pa. Super. Ct. 405). The testimony of a wife, supporting that of her husband, should at least be accorded the weight of a corroborating circumstance, which is sufficient to satisfy the equitable requirement. The difficulty is, not with the quality of the proof, but with the fact that it does not go far enough. The parol understanding, which is now set up, was that the plaintiff's salary should go on for a term to be subsequently agreed upon, and it was left in this incomplete and indefinite shape. There was no meeting of minds with regard to the term of the plaintiff's employment, not only at the time, but afterwards; for, when the written agreement came to be drawn, nothing was said on the subject. The parties were to fix the time, but never did so, and there it rests. We cannot say that the 20 years that the royalty was to run is to be taken; for the question of employment was not discussed when that period was fixed. When the parties came together at Mr. Dale's office to have the agreement drawn, they did not altogether agree as to the term to be put in,—the defendants wanting 20 years, and the plaintiff but 10 years; and it might have made a considerable difference if the matter of the plaintiff's employment had been drawn into the decision. The plaintiff may have thought, as he now says, that it was involved in what was agreed to; but we must have something more than that assumption to warrant us in going on and inserting in the contract a provision not found there. To authorize the reformation of a written instrument on the basis of a preceding parol agreement, a part of which has been omitted by mistake, it is essential that the agreement should be definite and complete, well understood, and agreed to by both parties. Without this we have nothing on which to proceed.

Nor can it be said that a continued employment is implied in the provision that royalties should be paid for the term designated, unless the plaintiff should voluntarily leave within that period. The evident purpose of this was to secure his continued services, if the defendants desired it; but it does not necessarily bind them to retain him, if they did not. It is a provision for their benefit, and not for his, except to the extent—which is no doubt implied—that the royalty should go on in case he was discharged. Nor is this affected by the fact that, in case of his death during the period named, the

royalty was to be paid to his wife at a reduced rate,—one-half. This may, indeed, show that the plaintiff's services were a material consideration to the defendant in the bargain which they made; but I cannot see that it goes further. If the plaintiff, upon his side, regarded his retention of equal importance, he should have expressly stipulated for it, as well as for the salary which he was to receive (of which, be it noted, there is not the remotest mention), instead of leaving both to doubtful implication.

There is another reason, which it seems to me may be urged for denying the relief asked, although I advance it with some hesitation because it was not discussed at the argument, and that is the delay with which the plaintiff is chargeable. The agreement was executed in September, 1891, and this bill was not filed until February, 1900, some eight years and five months afterwards, and in the meantime it had been accepted by him without question, and lived up to on the other side, and it is pretty late to now say that it does not express the entire agreement between the two. One who seeks to reform a contract on the ground of mistake should act promptly, and, if there is any great delay, he is called upon to explain and excuse it. Lapse of time is a serious obstacle to the attainment of the truth, and parties are entitled to its quieting effect on possible litigation. In the present instance the only explanation for the delay is that the plaintiff supposed he was protected by the contract as it was written, and was not disabused of that idea until his services were dispensed with in May, 1899, and that previous to that, even if he had known of the defect, as an employé of the defendants, it might not have been wise to litigate with them; but this can hardly be said to excuse his want of action. He was bound to know the purport of the writing within a reasonable time after it was executed, even if he did not; and if the present question had been brought up promptly, when the subject was fresh in the minds of both parties, and before any controversy had arisen, it is more than likely that it would have been adjusted amicably according to the facts as they were, or a satisfactory settlement agreed upon. But these observations are only advanced tentatively. As I have already said, I will not undertake to rest my disposition of the matter upon them, although I think they are worthy of serious consideration.

The next question is as to the proper construction to be given to the provisions of the contract with regard to the payment of royalty. According to its terms, the defendants, in consideration of the conveyance of the Fulton farm, were to pay the plaintiff a royalty of $1 per gross ton upon all ore shipped by them from their garnet mines in Bethel township, Delaware county, Pa., including not only the mines which they then owned and operated, but also those upon the property about to be conveyed, if possession thereof were obtained by them. It appears that the mines on the Fulton farm had been leased in August, 1884, for a term of 10 years, with the privilege of a renewal for 10 years more, on a royalty of 75 cents per ton, so that at the time the agreement was executed, in September, 1891, this lease was outstanding, and the lessees were in possession under it. Some sort of a notice to quit had been served, but it does not seem to have been

effective; for they continued in possession, and subsequently exercised, without question, the option to renew,. and have worked the property from that time to this, simply paying to the defendants the stipulated royalty. Notwithstanding that this is all the dominion which the latter have been able to exercise over these mines, the plaintiff contends that he is entitled to $1 a ton for each ton of ore which has been shipped by the lessees off of it. It is a sufficient answer to say that this is not according to the agreement. The right to receive a royalty from the defendants on the product of the Fulton farm was dependent upon their getting possession of it. It was to be on all ore shipped by them from their garnet mines in that township, including the mines on the property conveyed to them by the plaintiff, "if possession thereof be obtained by Herman Behr & Co." The word "if," here, is plainly equivalent to "when," or "provided," and expresses a condition; and the possession stipulated for is of the mines on the property, and not simply the farm part of it, or the reception of the royalty paid by the tenants; nor, while others were working and shipping ore from the property, could it be claimed that the defendants were so doing, which was also necessary in order to obligate them. These terms are too plain to permit us to speculate how they came to be brought about as the basis of some other construction; but it would not be difficult to find a reason why the defendants would not be likely to enter into any other. The plaintiff may have figured out an advantage to himself somewhat different, but that he mentioned it to Mr. Behr in discussing the bargain is sharply denied by that gentleman, and I am not called upon to decide between them.

It is argued, however, that the defendants have given a contemporary construction to the contract such as is now contended for; but the facts do not seem to me to bear this out. For three years and over no royalty was paid to the plaintiff on the ore mined from the Fulton farm, nor did he make the slightest request for it. Some time, however, in January, 1895, a bookkeeper of the defendant's firm called the attention of Mr. Heubach, one of the members of it (but not the one who had conducted the negotiations with the plaintiff), to the fact that no royalty appeared by the books to have been paid to Mr. Sharp on this farm. By the direction of Mr. Heubach, a letter was thereupon addressed to Mr. Sharp with regard to the subject, and an inquiry made as to whether he had received anything on account of such royalty, to which he replied that he had not. A statement was accordingly made out from the shipments reported by the tenants for the three years preceding, by which it was acknowledged that the defendants were indebted to the plaintiff, January 18, 1895, for 1,095½ tons, at $1 a ton, $1,095.50, on which $71.41 was allowed as interest on that which was mined in 1892 and 1893. The response of Mr. Sharp was that he had seen the error, but, knowing that he was dealing with reliable parties, he thought it would be made satisfactory to him when it was discovered. This was followed at the close of 1895 by a similar statement, by which he was again credited with $480.80 for ore mined up to the close of October of that year; and a second statement, January 4, 1896, by which he was further credited with 65.9 tons mined in December,

1895. Similar credits were given him through the years 1896, 1897, and 1898, until some time in the spring of the latter year, when, the attention of Mr. Herman Behr having been accidentally called to the subject, he pronounced the payments a mistake, and, the written contract being referred to, it was found that they were. Here the matter rested until January, 1899, when the defendants, in making out a statement for the royalty for 1898, after giving the plaintiff credit for that which had been mined from the Lancaster farm at $1 a ton, allowed a further credit for 570 tons and a fraction, from the Fulton farm, at 75 cents a ton, making $427.76. This was forwarded, with a letter stating that Mr. Behr had informed them that he had never made any arrangement for paying royalties on the Fulton farm, but that, as the plaintiff had been credited from time to time on account of them, at $1 a ton, which was 25 cents in advance of what they were receiving, they had concluded not to change it materially at that time, and so had credited him with but 75 cents, the actual amount paid them. If the terms of the agreement were doubtful, the defendants would be unquestionably concluded by this recognition of liability; but, as they are not, I do not see that any such result follows. In the light of what was written, these payments were a gratuity. The explanation of Mr. Heubach and Mr. Behr as to how the mistake occurred is reasonable and satisfactory; and the fact that no demand was ever made by the plaintiff, and that the subject was brought up by the defendants themselves voluntarily, confirms what they say. The silence of the plaintiff for over three years is certainly fully as significant as the subsequent acknowledgment by the defendants of a supposed obligation which did not really exist. Nor can I see that the crediting of the 75 cents royalty after the mistake had been discovered carries the matter any further than the rest of it. In the face of the agreement itself, it is plain, it was a donation, which they might make, if they chose, without the risk of having it establish a liability against them. My conclusion, therefore, is, on this part of the case, that the writing must be taken as it reads, and that there is no royalty due the plaintiff under it, excepting for a small balance unpaid on ore from the Lancaster farm.

By the fourth paragraph of the agreement, in case the defendants should at any time fail to pay the royalty, for a period of 90 days after written demand for the payment of the same had been duly made, the plaintiff was to have the right to call for a reconveyance of the property he had turned over to them upon repaying them the cost price. A demand has been made in pursuance of this provision, but it is resisted on two grounds: First, because there is nothing due; and, second, because the plaintiff has merely tendered a dollar, the consideration named in the agreement. The evidence establishes to my satisfaction, however, that there are arrears of royalty, and the only question is, how much? By the statement rendered January 5, 1899, the defendants acknowledged to have received from the Lancaster property 540 tons and a fraction, on which they credited the plaintiff with $540.60; also 28 tons and a fraction, on which they credited him with $14.40, which is at the rate of but 50 cents a ton. There seems to be no authority for the

latter reduction. If we assume that it is based on the inferior quality of the ore, which is designated as "Brown Ruby," the royalty was to be measured by quantity, and not quality, about which nothing is said in the agreement. It is true that in a letter, January 12, 1898, the previous year, the necessity for arranging the royalty on "Brown Ruby" is advanced, and 50 cents is suggested; but the defendants could not modify the contract at their will, and it nowhere appears that the plaintiff assented to it. On the contrary, in the receipt given March 18, 1899, for this ore, he is very particular to accept the $14.40 as a payment on account only, so that the balance—$14.40— is unquestionably due. This may seem a small sum for which to forfeit the defendants' estate in the property; but they have chosen to abide by it, and I cannot say that it would be unconscionable to hold them to their agreement. Besides that, I am persuaded that considerably more than this has been withheld. According to the plaintiff's testimony, which is not contradicted, there were 802 tons of ore shipped in 1898, of which he has been credited with only 540 tons and a fraction, leaving 260 tons unaccounted for. These figures may need further verification before they are accepted in their entirety, but there is enough in the record to substantiate a part of them. In a statement furnished June 20, 1898, there is a deduction or dockage on different shipments running from 10 per cent. up to 25 per cent., and amounting in the aggregate to 82,474 pounds, or about 37 gross tons. This dockage is claimed on account of dirt, and yet with regard to the shipment of April 25th, which forms a part of it, in a letter of that date, as well as one of the day following, we find the character of the ore actually commended. To that extent, at least, the dockage is discredited, and the burden is on the defendants to maintain the rest of it. No doubt they are only liable for royalty on refined or cleaned ore, but the plaintiff testifies that all of it was treated to the usual process for cleaning it, and there is no evidence to the contrary. The fact is—as is manifest from the letters which passed at the time—that it is the quality of the ore with which the defendants were dissatisfied, and for this the plaintiff was not responsible. It may be that the plaintiff is not able to avail himself of these particular arrears as a ground of forfeiture, no demand for them having been made in the request for a reconveyance; but that does not prevent us from considering them in weighing the equities, and (to prevent a misconception) the plaintiff will, of course, be entitled to bring them forward in the accounting before the master. It cannot be said, therefore, to be aside from the case to have discussed them here.

But, to secure a reconveyance, the plaintiff must undoubtedly pay the defendants what the property originally cost them, which was not $1, but $3,500. Not only is this the consideration named in the conveyance, but the same thing is established by the plaintiff's own testimony. The amount was made up of a legacy of $700, charged on the land in favor of Mrs. Sharp, a judgment note of $1,200, $500 borrowed by the plaintiff from his brother-in-law, Howell, and $1,100 borrowed from Mr. Behr. All these matters were taken care of by the defendants in the transaction, and they must be reimbursed for them before they can be compelled to give up the property. The tender of $1 was

altogether insufficient, and might as well not have been made; but this can be adjusted in the decree. It does not bar the plaintiff from the reconveyance to which he has shown himself otherwise entitled.

It remains to consider the question of damages for breach of the contract by reason of the failure of the defendants to continue mining. Ordinarily this would have to be made the subject of an action at law, and could not be recovered by bill (Appeal of Pittsburgh & C. R. Co., 99 Pa. 177); but, having acquired jurisdiction upon other grounds, it is proper to go on and do complete justice in the premises. As a material part of the compensation for the transfer of the Fulton farm, the plaintiff, as we have seen, was to receive a royalty of so much per ton for 20 years on the ore mined and shipped by the defendants from their mines in that vicinity, and this was to be forfeited if he voluntarily left their employ within that period. Having obtained his property in this way, and tied up his services, they certainly owed him some reciprocal obligation. While no minimum annual quantity was stipulated for, the law will imply an undertaking to operate the mine with reasonable diligence. This is the rule where lands are conveyed for mining purposes, reserving a royalty based on the extent of the product (Watson v. O'Hern, 6 Watts, 362; Lyon v. Miller, 24 Pa. 392; Koch's Appeal, 93 Pa. 434; Ray v. Gas Co., 138 Pa. 571, 20 Atl. 1065, 12 L. R. A. 290, 21 Am. St. Rep. 922; Aye v. Philadelphia Co., 193 Pa. 452, 44 Atl. 555, 74 Am. St. Rep. 696; Huggins v. Daley, 40 C. C. A. 12, 99 Fed. 606, 48 L. R. A. 320); but the principle is one of general application (Appeal of Pittsburgh & C. R. Co., 99 Pa. 177), and is properly invoked in the present instance, although there is nothing more than a contractual relation between the parties. Without it the plaintiff is at the mercy of the defendants, who can hold the property conveyed to them, and yet do nothing, depriving him of all benefit from the transaction; and while he can not quit their service, at the peril of losing the whole bargain, they, at the same time, are at liberty to discharge him when they will. By all that is just and reasonable, it must be assumed under the circumstances that it was in the contemplation of the parties that the mining operations should go on and be prosecuted with proper diligence, and, as they have not, the plaintiff is entitled to such damages as he has sustained.

Let a decree be drawn directing a reconveyance of the Fulton farm to the plaintiff on payment to the defendants of the sum of $3,500, without interest, the plaintiff to be entitled as a credit thereon, to the sum of $2,000 moneys in their hands which he has loaned to them, with such interest as may be due thereon, and that he be given a further credit for any royalties due from the defendants for ore mined and shipped from the Lancaster, but not from the Fulton farm; and let the case be referred to a master to determine the amount of such royalties, and to settle and adjust the accounts between the parties, and to further assess the damages sustained by the plaintiff by reason of the breach by the defendants of the implied undertaking to prosecute their mining operations on the Lancaster farm with reasonable diligence, such damages to be allowed as a further credit to plaintiff in the said account; and let the defendants pay the costs of suit.